UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE TOWN OF AMHERST,

                            Plaintiff,

        v.                                                    **DECISION AND ORDER**

CUSTOM LIGHTING SERVICES, LLC,                 07-CV-261S

                            Defendant.

## I.  INTRODUCTION

        Plaintiff Town of Amherst ("the Town") commenced this action on April 5, 2007, by

filing a Verified Petition in New York State Supreme Court, Erie County, seeking to

permanently stay an arbitration brought by Defendant Custom Lighting Services, LLC

("CLS").[1]  CLS then removed the case to this Court, pursuant to 28 U.S.C. § 1332.  (Docket

No. 1.)  CLS has filed its opposition to the Town's Petition[2] and the matter is now fully

briefed.   Having reviewed the parties' submissions, this Court finds oral argument

unnecessary.

---

[1]  The Verified Petition includes appended Exhibits A through J.  In addition, the Town filed the Affidavit of George A. Woodbury ("Woodbury Aff.") with Exhibit A, a Memorandum of Law ("Town MOL"), a Reply Memorandum of Law ("Town Reply"), the Reply Affidavit of Michael B. Powers, Esq. ("Powers Aff.") with Exhibits A through F, and the Reply Affidavit of Shelly Schratz ("Shratz Aff.").

[2]  In opposition, CLS filed the Affidavit of Jeffrey B. Rosen, Esq. ("Rosen Aff.") with Exhibits 1 through 9, the Affidavit of Eric S. Vogel ("Vogel Aff.") with Exhibits 1 through 5, and a Memorandum of Law in Opposition ("CLS MOL").

## II.  BACKGROUND

This action concerns the arbitrability of a dispute arising out of the second of two agreements executed by the Amherst Town Supervisor and CLS.  (Docket No. 1, Petition, Ex. E.)  The background, as set forth in the parties' pleadings, affidavits and exhibits, is as follows.

On December 8, 2003, the Town executed a contract with CLS (the First Agreement) which was directed toward improving the quality of the Town's street lighting services, then provided by Niagara Mohawk Power Corporation (NiMo).  (Petition ¶ 7, Ex. B.)  Under the First Agreement, CLS was to develop a business plan detailing its ability to provide street lighting services at a minimum 5 percent annual cost reduction over NiMo's rate, exclusive of energy and delivery charges.  (*Id*. ¶ 8, Ex. B at 4, 15.)  If CLS's business plan demonstrated annual savings of at least 5 percent, the First Agreement required that the Town "shall engage [CLS] to perform the services defined in Statement of Work B" by way of a separate agreement, to be executed within 45 days of the Town's review and approval of the CLS business plan.  (*Id.* Ex. B at 4.)  Under the scope of work in Statement of Work B, CLS was to, among other tasks: (1) prepare an asset inventory, if required; (2) negotiate the purchase of street light infrastructure from NiMo or, if more cost effective, reconstruct the system; (3) work with the Town to develop a process to report trouble calls; and (4) provide ongoing street light repair and maintenance.  (*Id.* Ex. B at 16.)

On February 27, 2004, CLS submitted its business plan to the Town.  (*Id.* ¶ 13, Ex. C.)  The plan's financial assessment indicated that the Town would realize annual savings of 13 to 47 percent by pursuing ownership of street lights, rather than renting those assets

from NiMo.  (*Id.* Ex. C at 2.)  CLS recommended that the Town "proceed with negotiations

for acquiring the street light assets with a backup position of system reconstruction."  (*Id.*)

Approximately seven months after receiving CLS's business plan, on September 20, 2004,

the Amherst Town Board (the Board) considered and approved the following resolution:

> WHEREAS, the Town of Amherst has had long standing concerns about the quality of streetlighting services provided to the Town of Amherst by Niagara Mohawk; and
>
> WHEREAS, the Town of Amherst has entered into negotiations with Custom Lighting Services (CLS), a private contractor that specializes in the installation, operation and maintenance of municipal lighting systems, regarding potential improvements to the effectiveness and efficiency of the installation, operation, and maintenance of the streetlighting system in the Town of Amherst; and
>
> WHEREAS, CLS has provided information suggesting that it can install, operate and maintain a streetlighting system in the Town of Amherst at significant savings to the Town of Amherst after accounting for the cost of installation and the continuing requirement that electricity be purchased from Niagara Mohawk;
>
> NOW, THEREFORE, BE IT RESOLVED, that the **Supervisor is authorized to sign a contract with CLS, upon resolution of its final terms to the satisfaction of the Town Attorney, CLS, and any department heads, if necessary, authorizing CLS to commence negotiation with Niagara Mohawk toward the purchase of existing streetlighting stock in the Town of Amherst currently owned by Niagara Mohawk and for such other ancillary services as may be necessary to accomplish the goal of lowering the cost of streetlighting services and leading to the ownership of streetlighting assets by the Town of Amherst.**
>
> BE IT FURTHER RESOLVED, that any contract to buy out Niagara Mohawk facilities shall be subject to Town Board approval.

(*Id.* Ex. D) (emphasis supplied).

On October 28, 2004, CLS's General Manager executed a Professional Services

Contract between the Town and CLS.  (*Id.* Ex. F.)  Each page of the Contract includes the

3

term "Final" in a footer.  (*Id.*)  On November 15, 2004, the Town Board considered and approved the following resolution regarding a contract with CLS:

> WHEREAS, the Town of Amherst has had long standing concerns about the quality of streetlighting services provided to the Town of Amherst by Niagara Mohawk; and
>
> WHEREAS, the Town of Amherst has entered into negotiations with Custom Lighting Services (CLS), a private contractor that specializes in the installation, operation and maintenance of municipal lighting systems, regarding potential improvements to the effectiveness and efficiency of the installation, operation, and maintenance of the streetlighting system in the Town of Amherst; and
>
> WHEREAS, CLS has provided information suggesting that it can install, operate, and maintain a streetlighting system in the Town of Amherst at significant savings to the Town of Amherst after accounting for the cost of installation and the continuing requirement that electricity be purchased from Niagara Mohawk;
>
> NOW, THEREFORE BE IT RESOLVED, that **the Supervisor is authorized to sign a contract with CLS authorizing CLS to commence negotiation with Niagara Mohawk toward the purchase of existing streetlighting stock in the Town of Amherst currently owned by Niagara Mohawk and upon the failure to successfully conclude such negotiations to oversee the design and construction of streetlighting assets in the Town of Amherst.**

(*Id.* Ex. E.)  Following passage of the resolution, on November 18, 2004, the Town Supervisor executed the Professional Services Contract previously signed by CLS (the Second Agreement).  (*Id.* Ex. F.)  The Second Agreement contains a dispute resolution process, the final step being "arbitration in accordance with the Construction Industry Rules of the American Arbitration Association."  (*Id.* at 21.)

After the Second Agreement was executed, CLS conducted a survey of the Town's street lighting system (location, attributes and physical deficiencies of each street light) to assist in determining a fair purchase price.  (Vogel Aff., ¶ 13.)  It then engaged in

negotiations with NiMo on the Town's behalf and, in May 2005, the Town and NiMo reached an agreement in principal.  (*Id*. ¶¶ 14-15.)  On June 21, 2005, the Town Supervisor and NiMo executed a Memorandum of Understanding to outline terms and conditions for the proposed sale by NiMo of certain street light assets to the Town for the sum of Ten Million Three Hundred Thousand Dollars.  (*Id*. Ex. 5.)

The Town then requested that CLS update its cost savings estimate.  (*Id*. ¶ 16.) After doing so, CLS agreed to execute a performance bond to guarantee that the Town would save a minimum of Seven Hundred Eighty Thousand Dollars annually, for the first seven years.[3]  (*Id*. ¶ 17.)  At the Town's request, CLS proceeded to prepare transactional documents, which NiMo approved on August 10, 2005.  (*Id*. ¶ 21; Petition, Exs. F and G.) Thereafter, however, the Town Board rejected both a resolution authorizing the issuance of bonds to fund the purchase from NiMo and a resolution for the preparation of an RFP for alternative financing.  (Petition, Exs. G and H.)  In short, the Board did not approve the buy out of NiMo assets.

By letter dated July 11, 2006, CLS's General Manager demanded payment of its unpaid invoices for services rendered under the Second Agreement, and requested a meeting with the Town pursuant to the Agreement's dispute resolution provisions.  (*Id*. Ex. J.)  On July 26, 2006, CLS's attorney wrote to the Town's legal counsel, noting the Town's failure to make payment or attempt resolution and requesting a meeting of senior management.  (*Id*. ¶ 55, Ex. A.)  Counsel went on to advise the Town's attorney that CLS considered the Town's July 25, 2006 notification that it would not continue its Professional

---

[3] Based on the figures in Vogel's Affidvit, this reflected a cost reduction of approximately 34 percent.

Services Contract with CLS to constitute termination of the Second Agreement, requiring payment of liquidated damages of One Million Fifty-nine Thousand Five Hundred Nineteen Dollars.  (*Id.*)  Counsel requested payment of this additional amount and, if payment was not forthcoming, dispute resolution in accordance with the Second Agreement's provisions.  (*Id.*)  The Town did not respond to either letter and CLS made a demand for arbitration dated August 28, 2006.  (Petition ¶¶ 55, 57 and Ex. A.)

The Town objected to the propriety of CLS's arbitration demand and later petitioned for a stay of arbitration in state court.  According to the Town, this dispute is not subject to arbitration because: (1) the Second Agreement is invalid and unenforceable in its entirety; (2) CLS failed to comply with a condition precedent to arbitration; (3) CLS's claim is time-barred; and (4) only the courts, not an arbitrator, can award CLS the punitive damages it seeks.  The Town contends that each of these questions is governed by state law.

CLS argues that the Federal Arbitration Act (the Act), not state law, governs a determination of the arbitrability of this dispute.  Without conceding the issue, the Town, in its reply memorandum, "assume[s] *arguendo* that the [Act] applies to the arbitrability issues and New York law applies to contract formation and substantive law issues."  (Town Reply at 5-6.)

## III.  DISCUSSION

### A.    Applicability of the Federal Arbitration Act

Congress enacted the Federal Arbitration Act to overcome judicial resistance to arbitration.  The Act's coverage provision, 9 U.S.C. § 2, compels judicial enforcement of arbitration agreements "in any . . . contract evidencing a transaction involving commerce."

In <u>Allied-Bruce Terminix Cos.  v. Dobson</u>, the Supreme Court interpreted the "involving commerce" phrase as implementing Congress' intent "to exercise [its] commerce power to the full."  513 U.S. 265, 277, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995).  "The 'liberal federal policy favoring arbitration agreements,' manifested by this provision and the Act as a whole, is at bottom a policy guaranteeing the enforcement of private contractual arrangements." <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 625, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985) (quoting <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>,  460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)).

This Court concludes that a determination of the arbitrability of this commercial dispute between a Delaware limited liability company with its principal office in Missouri and a New York municipal corporation is within the broad coverage of the Act.

**B.      Standard of Review**

Procedurally, this case is similar to that of <u>Bensadoun v. Jobe-Rait</u>, 316 F.3d 171 (2d Cir. 2003).  There, the plaintiff commenced an action seeking to enjoin the defendants from pursuing arbitration.  The defendants filed papers opposing the request, but did not move  to dismiss, for summary judgment, or to compel arbitration.

The Second Circuit held that, irrespective of the absence of a dispositive motion, district courts should apply the summary judgment standard when faced with the question of whether to stay or compel arbitration.  *Id.* at 175.  Summary judgment is warranted where the "pleadings . . .  together with the affidavits [and exhibits], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "An alleged factual dispute regarding immaterial

or minor facts between the parties will not defeat . . . summary judgment." Powell v. National Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (citation omitted). "A party resisting arbitration . . . must show that, if proven, [its] allegations would relieve any obligation to arbitrate, and [it] must produce some evidence to substantiate [its] factual allegations." Doctor's Associates, Inc., v. Distajo, 944 F. Supp. 1010, 1014 (D. Conn. 1996), aff'd, 107 F.3d 126 (2d Cir. 1997), cert. denied, 522 U.S. 948, 118 S. Ct. 365, 139 L. Ed. 2d 284 (1997) (internal citations and quotation marks omitted).

Under this standard, if the record presented requires that the issue of arbitrability be resolved against the plaintiff, the petition may properly be dismissed and arbitration compelled. Bensadoun, 316 F.3d at 175. But "[i]f there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary" before a determination on arbitrability can be made. Id.

**C.    Analysis**

**1.    *Waiver of the Right to Seek a Stay of Arbitration***

In opposition to the Town's petition, CLS first urges that the Town waived its right to seek a judicial stay of arbitration because it actively participated in arbitration for seven months before commencing this action.   A district court may find that a party waived its objection to the arbitrability of a dispute if it participated extensively in arbitration proceedings without asserting a timely objection. Application of Herman Miller, Inc., 97 Civ. 7878, 1998 WL 193213, at *1 (S.D.N.Y. Apr. 20, 1998, aff'd, No. 98-7732, 1999 WL 132183, at *1 (2d Cir.  Mar. 9, 1999).  Neither of these predicates to a finding of waiver exists here.

On September 24, 2006, the Town's attorney notified CLS's counsel and the American Arbitration Association that neither the July 26, 2006 demand for a meeting nor the August 28, 2006 arbitration demand were served on the Town in the manner designated in the Second Agreement.  Counsel further stated the Town's belief that the "request for arbitration is not properly before [it]."  (Powers Aff., Ex. A.)  The Town subsequently obtained outside counsel who stated, on December 8, 2006, that "CLS' demand for arbitration and the arbitration itself are improper."  (*Id.*)  In a December 15, 2006 email, outside counsel urged that the "proposed arbitration should be discontinued unless and until a court of competent jurisdiction decides otherwise."  (*Id.* Ex. C.)  The Town's participation in arbitration included seeking a change of venue, and engaging in the selection of arbitrators after obtaining CLS's agreement that it would not claim waiver based on that activity.  (*Id.* Exs. A, E, F.)

Under these circumstances—which include repeated protests by the Town and minimal participation in the preliminaries to arbitration—this Court rejects CLS's contention that the Town waived its right to seek a judicial stay.  Application of Herman Miller, Inc., 97 Civ. 7878, 1998 WL 193213 (S.D.N.Y. Apr. 21, 1998) (no waiver where party seeking stay requested that venue be moved, submitted a list of proposed arbitrators, and participated in a preliminary hearing to set the date for arbitration before commencing state court action); *see also*, Opals on Ice Lingerie, Designs by Bernadette, Inc. v. Bodylines, Inc., 320 F.3d 362, 366-69 (2d Cir. 2003) (participation in preliminaries to arbitration and three days of hearings did not constitute waiver where party seeking stay had objected repeatedly to arbitration and unsuccessfully sought a TRO and preliminary injunction to prevent the

arbitration from going forward); <u>Woodcrest Nursing Home v. Local 144, Hotel, Hosp.,</u> <u>Nursing Home and Allied Servs. Union</u>, 788 F.2d 894 (2d Cir. 1986) (per curiam) (no waiver where participation in arbitration largely involved requests for delay and postponement and no hearings had taken place).

**2**.     ***The Existence and Validity of the Parties' Agreement***

        In petitioning for a permanent stay of arbitration, the Town alleges that the Second Agreement is invalid and unenforceable because: (1) the Town Supervisor was not authorized to sign it; (2) the Supervisor was fraudulently induced to sign it by CLS's misstatement of potential cost savings; and (3) one of its provisions, Section A-4, awards CLS work for which competitive bidding is required by state law.

        The Town urges that it is for the courts, and not an arbitrator, to decide each of these issues.  Not surprisingly, CLS contends that each of the Town's allegations must be decided by an arbitration panel, not the courts.  As discussed more fully below, this Court disagrees with both parties and finds that the Town's first challenge requires a judicial determination, while the second and third should be decided by an arbitrator.

*a.   Contract Validity*

        The United States Supreme Court recently took up the issue of whether a court or an arbitrator should consider challenges to a contract containing an arbitration provision in <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006). There, the respondents claimed that the entire agreement, including its arbitration provision, was illegal and void because it contained usurious interest rates that violated various Florida lending and consumer protection laws.  546 U.S. at 443.  The

Florida Supreme Court rejected the petitioner's contention that the question of the contract's legality should go to the arbitrator, reasoning that to enforce an agreement to arbitrate in a contract challenged as unlawful "could breath life into a contract that not only violates state law, but also is criminal in nature . . . ."  *Id.* (quoting Cardegna v. Buckeye Check Cashing, Inc., 894 So. 2d 860, 862 (2005) (citation and internal quotation marks omitted)).   The Supreme Court granted *certiorari* to consider whether a court or an arbitrator should decide the issue.

The Supreme Court first divided challenges to the validity of agreements into two types; those that specifically challenge the validity of the parties' agreement to arbitrate, and those that challenge the validity of the entire contract.  546 U.S. at 444.  The Court went on identify three propositions established in its prior decisions: (1) as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract; (2) unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance; and (3) this arbitration law applies in state as well as federal courts.  546 U.S. at 445-46 (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967) (alleged fraud in the inducement of enter agreement) and Southland Corp. v. Keating, 465 U.S. 1, 104 S. Ct. 852, 79 L. Ed. 2d 1 (1984) (certain contract provisions allegedly violative of state law)).

After noting that the Buckeye contract was alleged to be illegal and void in its entirety, the Supreme Court went on to apply these three propositions to the dispute before it.  It expressly reaffirmed its earlier holding in Prima Paint and found that a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must

11

go to the arbitrator.  Buckeye, 546 U.S. at 446, 449.    In Prima Paint, the Supreme Court examined Section 4 of the Act[4] and held that "a federal court may consider only issues relating to the making and performance of the agreement to arbitrate."  388 U.S. at 403-404.  Thus, "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it.  But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally."  Id.

The facts and holdings of Prima Paint (fraudulent inducement) and Buckeye (contract violates state law) go directly to the Town's second and third challenges alleging that the Town Supervisor was fraudulently induced to enter into the Second Agreement and that the Agreement violates state law because certain of the included work was not competitively bid.  Both challenges are to the validity of the Second Agreement as a whole, and not to the validity of the parties' agreement to arbitrate disputes arising out of the Agreement.  It now is well-settled that such challenges are for the arbitrator to decide.  Thus, the Town's claims that the Second Agreement is unenforceable due to fraud and illegality do not provide a basis for this Court to stay arbitration.

b.    The Existence of a Contract

The Town's first challenge—that the Town Supervisor was not authorized to sign the Second Agreement—is a different matter.    In Buckeye, the Supreme Court distinguished the issue of a contract's validity from the issue of whether any agreement

---

[4]  Section 4 states, in pertinent part, that "upon being satisfied that *the making of the agreement for arbitration* or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.  * * * If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."  9 U.S.C. § 4 (emphasis supplied).

between the parties was ever concluded.  546 U.S. at 444 n.1.  The first scenario includes

such questions as whether a contract was fraudulently induced, is rendered invalid based

on a violation of state law, or is unconscionable.  *See* JLM Indus. v. Stolt-Nielsen SA, 387

F.3d 163, 170 (2d Cir. 2004) ("Claims of unconscionability and adhesion contracts are [ ]

included within the Prima Paint rule.") (internal citation and quotation marks omitted).  The

second includes questions of whether a party actually signed the contract, was authorized

to sign it, or had the mental capacity to assent.  546 U.S. at 444 n.1 (citations omitted).

The Supreme Court expressly stated that its application of the Prima Paint rule to the facts

in Buckeye did not speak to challenges to the existence of a contract.  *Id.*

The Second Circuit and the Southern District of New York have squarely addressed

this question and concluded that the Prima Paint rule does not apply to challenges to the

existence of a contract containing an arbitration provision.  *See* Denney v.BDO Seidman,

L.L.P., 412 F.3d 58, 68 (2d Cir. 2005) (courts may not compel a party to arbitrate a dispute

where there is a genuine issue as to whether that party actually entered into an agreement

to arbitrate); Sphere Drake Ins. Ltd v. Clarendon Nat. Ins. Co., 263 F.3d 26, 31-32 (2d Cir.

2001) (distinguishing a "void" contract—one that does not come into existence because,

for example, the parties failed to agree to essential terms, from a "voidable" contract—one

that imposes obligations on the parties unless rescinded based on some defense such as

fraud in the inducement, and holding that a party alleging a contract is void may be entitled

to a trial prior to arbitration); *see also*, Nuclear Elec. Ins. v. Central Power & Light Co., 926

F. Supp. 428, 433-35 (S.D.N.Y. 1996) (holding that claims that a party never actually

manifested assent to the contract must be decided by the court, but challenges to avoid

a contract the parties assented to must be decided by the arbitrator because such claims are simply defenses to arbitrability that are themselves arbitrable); PMC, Inc. v. Atomergic Chemetals Corp., 844 F. Supp. 177, 181 (S.D.N.Y. 1994), aff'd, 122 F.3d 1057 (2d Cir. 1995) (reading Prima Paint as "limited to challenges seeking to avoid or rescind a contract—not to challenges going to the very existence of a contract that a party claims never to have agreed to") (citation and internal quotation marks omitted).  In short, this Circuit has determined that challenges to the existence of an agreement are for the courts to decide.

Here, the Town alleges that its Supervisor was not authorized to commit the Town to the Second Agreement.  To raise a material issue on the threshold question of whether the Town ever entered into an agreement, the Town must provide an unequivocal denial that the agreement was made, and some evidence to substantiate the denial.  Sphere Drake, 263 F.3d at 30 (citing Interocean Shipping Co. v. National Shipping & Trading Corp., 462 F.2d 673, 676 (2d Cir. 1972), cert. denied, 423 U.S. 1054, 96 S. Ct. 785, 46 L. Ed. 2d 643 (1976) and Almacenes Fernandez, S.A. v. Golodetz, 148 F.2d 625, 628 (2d Cir. 1945)).  If an agreement to arbitrate is found to exist, a district court must then determine whether the dispute at issue falls within the scope of that agreement.  Cap Gemini Ernst & Young, U.S., LLC v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003).

In urging that no contractual obligation was created here, the Town relies on New York Town Law § 64, which describes the general powers of town boards.  The statute provides that town boards "[m]ay award contracts for any of the purposes authorized by law and the same shall be executed by the supervisor in the name of the town after approval by the town board."  N.Y. Town Law § 64(6) (McKinney 2007) (emphasis

14

supplied).   According to the Town, the Supervisor agreed to terms in the Second Agreement that the Town Board did not approve, thereby exceeding her authority and rendering the entire agreement void.   The Town offers the affidavit of one of its Councilmembers, Shelly Schratz, who attests that "the Town Board authorized the Supervisor to sign a contract <u>only</u> for CLS to 'commence negotiations' with Niagara Mohawk."[5]  (Schratz Aff., ¶ 12.)  Ms. Shratz contends that the Board never authorized the Supervisor to agree to a number of the Second Agreement's terms including, among other things, the inventory of the Town's street light system and preparation of transactional documents that CLS now seeks payment for.[6]  (*Id.* ¶ 14.)  The Town argues that because the Supervisor exceeded the Board's express limitation on her authority, her signature does not give rise to any contractual obligation.  In this Court's view, the Town has offered an unequivocal denial that the agreement was made.  The question that remains is whether it has also offered evidence that supports the denial.

Ms. Shratz points to the September 20, 2004 and November 15, 2004 resolutions set forth in full above.  These resolutions are the appropriate starting point since "the authority of [municipal] officers and agents is a matter of public record [and] there is a conclusive presumption that persons dealing with them know the extent of their authority." City of Zanesville v. Mohawk Data Sciences Corp., 97 A.D. 2d 64, 66 (4th Dep't 1983)

---

[5]  Literal acceptance of Ms. Schratz's affidavit compels the conclusion that CLS was not authorized to complete negotiations, but merely to commence them.

[6]  Ms. Schratz also objects to: a not-to-exceed allowance to repair deficiencies in assets purchased from NiMo, a provision pursuant to which the Town would award a reconstruction contract to the lowest qualified bidder in the event it was unable to reach an agreement to acquire assets from NiMo, the agreement to use CLS for project management services in the event of reconstruction, the agreement to pay CLS a cost-saving incentive, and the agreement to pay an annual unit price for street light maintenance.  (Schratz Aff. ¶ 14, citing Petition, Ex. F at 4-8, 14-15).

(citations omitted).

In the September 20, 2004 resolution, the Town Board authorized the Supervisor to sign a contract with CLS to commence negotiations with NiMo and provide ancillary services leading to the Town's ownership of street lighting assets.  The Town has not explained how assessing the value of the NiMo assets for purposes of negotiations and later preparing transactional documents for a buy out are outside the scope of services "ancillary" to the Board's express intent to transition from leasing to owning its street lighting.

Both the First Agreement and CLS's Business Plan contemplate that once the Town obtained ownership, CLS would maintain the Town's street lighting assets if it could do so at a lesser cost than what the Town was then paying.  On September 20, 2004, the Town Board authorized the Supervisor to sign a contract with CLS to provide ancillary services as may be necessary to accomplish the goal of lowering the cost of street lighting services. The Town has not explained how the acceptance of CLS's promise of more cost effective maintenance work is outside the scope of services "ancillary" to the Board's stated goal of lowering its overall costs for services.

On September 20, 2004, the Town Board authorized the execution of a contract with CLS upon resolution of its final terms to the satisfaction of the Town Attorney and any department heads, if necessary.  The Town has not come forward with any evidence suggesting that the necessary approvals were not forthcoming.  Ms. Schratz has not suggested that the Town Board was unaware of the terms of the Second Agreement—set forth in a document denoted as "Final" and executed by CLS on October 28, 2004—when it considered and passed its November 15, 2004 resolution.  That resolution authorized the

Supervisor to sign a contract with CLS to commence and conclude negotiations with NiMo and, failing a successful conclusion, to oversee the design and construction of new street lighting assets.  In short, to provide project management services for reconstruction, if necessary.

This Court finds that there is nothing on the face of these resolutions that limits the Supervisor's authority in the manner claimed—specifically, to sign a contract with CLS *only* to "commence negotiations" with NiMo.  (Schratz Aff. ¶ 12.)  The Town has not offered any other evidence that its enumerated challenges to the Second Agreement are outside the scope of the authority it granted the Supervisor when it authorized her to enter into a contract with CLS.   In sum, the Town has failed to raise a material issue on the threshold question of whether the Town ever entered into the Agreement.

The Town has not addressed the question of whether the dispute for which CLS seeks arbitration falls within the scope of the Second Agreement's dispute resolution provision.   Nevertheless, this Court must consider the question.   Under the Second Agreement, "in the event of a dispute, the following stepped process will be followed," the final step being arbitration.  (Petition, Ex. F at 21.)  This provision is exceedingly broad in that it does not even limit arbitration to disputes "arising under" the Second Agreement. The Second Circuit has recognized that a broad arbitration clause, such as this one, gives rise to a presumption of arbitrability.  Oldroyd v. Elmira Savings Bank, 134 F.3d 72, 76 (2d Cir. 1998).  The presumption of arbitrability that attaches to CLS's claims can be overcome only "if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that [it] covers the asserted dispute." Sinnett v. Friendly Ice Cream Corp., 319 F. Supp. 2d 439, 444 (S.D.N.Y. 2004) (quotation and citation omitted).  That is

not the case here, where the dispute clearly relates to the Second Agreement.

In summary, the Town fails to raise a material question as to whether the Supervisor was authorized to sign the Second Agreement and does not challenge the presumptive arbitrability of the instant dispute.  Accordingly, arbitration will not be stayed on the ground that the Town has no contractual obligation to CLS.

**3.    *Compliance with a Condition Precedent to Arbitration and Timeliness***

The Town urges that, pursuant to Town Law § 65, CLS was required to file a notice of claim before commencing arbitration against the Town.  The statute provides, in pertinent part, that:

> [N]o action shall be maintained against a town upon or arising out of a contract entered into by the town unless . . . a written verified claim shall have been filed with the town clerk within six months after the cause of action shall have accrued.

N.Y. Town Law § 65(3).  The Town argues that because CLS did not file a notice of claim, its arbitration demand is a nullity.  Further, the Town contends that CLS's claim is now time-barred because it accrued more than six months ago and the time in which to file a notice of claim has expired.  The arbitration must be permanently stayed, says the Town, because the filing of a notice of claim is an unconditional state law prerequisite to arbitration.  *See, e.g.*, Town of Islip v. Stoye, 29 N.Y.2d 524 (1971).

CLS responds that: (1) the Federal Arbitration Act requires that this issue be determined by an arbitrator, not this Court; (2) the failure to comply with the statutory notice of claim requirement is of no consequence because it otherwise provided the Town with ample notice of its claim; and (3) its time to file a notice of claim has not expired because tolling applies.  The threshold question is whether this Court or an arbitrator should apply

Town Law § 65(3) to the underlying dispute.

When a federal court is asked to stay or compel arbitration, it may consider "only issues relating to the making and performance of the agreement to arbitrate." Prima Paint, 388 U.S. at 403-404.  Such issues are generally referred to as "questions of arbitrability." In Howsam v. Dean Witter Reynolds, Inc., the Supreme Court recently considered the scope of the phrase "question of arbitrability."  537 U.S. 79, 84-85, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002).  At issue was whether the court or an arbitrator should apply an arbitration rule of the National Association of Securities Dealers (NASD), limiting the time in which a claim could be brought.  *Id.* at 81.

The Supreme Court first characterized the time limitation issue as a "gateway question," and noted that "[l]inguistically speaking, one might call any dispositive gateway question a 'question of arbitrability,' for its answer will determine whether the underlying controversy will proceed to arbitration on the merits."  *Id.* at 83.  But, relying on its prior decisions, the Court concluded that the phrase "question of arbitrability" refers only to those narrow circumstances where disposition by the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.  *Id.* at 83-84.  More specifically,  where there is a question as to whether the parties are bound by an arbitration clause, or whether a particular controversy falls within an arbitration clause.  *Id*. at 84 (citations omitted).    These are precisely the same limitations recognized earlier in Prima Paint.

In contrast, procedural questions that bear on the final disposition of the dispute are presumptively not for the court to decide.  Howsam, 537 U.S. at 84.  So it is for an

arbitrator to decide whether a party has complied with a grievance procedure, or whether recovery is barred based on a defense such as waiver, time limitation, lack of notice, laches, estoppel or some other condition precedent to an obligation to arbitrate. *Id*. at 84-85 (citing John Wiley v. Livingston, 376 U.S. 543, 557, 84 S. Ct. 909, 11 L. Ed. 2d 898 (1964); Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983); Revised Uniform Arbitration Act of 2000, § 6(c) and comment 2, 7 U.L.A. 12-13 (Supp. 2002)).

Following precedent developed under the Federal Arbitration Act, the Howsam Court concluded that the NASD time limit's applicability was presumptively a question for the arbitrator, not for the court.  537 U.S. at 85.  Likewise, this Court must conclude that the question of whether CLS failed to give notice of its claim in the appropriate manner and timeframe, thereby precluding a determination on the merits, is a matter for the arbitrator in the first instance.  This Court sees no reason to treat the Town's procedural argument as falling outside the presumption because it is based on state law as opposed to a contract term or arbitration rule.  Town Law § 65(3), like the arbitration rule in Howsam, does not raise a "question of [the underlying dispute's] arbitrability;" rather, it is a defense to a consideration of that dispute on the merits.  It is not a question for this Court to decide and is not a reason to stay arbitration.

**4.     *CLS's Claim for Punitive Damages***

CLS is seeking punitive damages in arbitration.  (Petition, Ex. A.)  The Town contends that because New York law prohibits arbitrators from awarding punitive damages, arbitration must be stayed and the merits of this dispute and the extent of any relief

20

determined by this Court instead.

CLS responds that the United States Supreme Court considered and rejected this very argument in <u>Mastrobueno v. Shearson Lehman Hutton, Inc.</u>, 514 U.S. 52, 115 S. Ct. 1212, 131 L. Ed. 2d 76 (1995). There, the respondent, who had lost an arbitration, challenged the arbitrator's award of punitive damages on the ground that New York law prohibited arbitrators from making such an award. After considering the terms of the parties' agreement and the relevant arbitration rules, the Supreme Court determined that an award of punitive damages was within the scope of the agreement and should have been enforced by the Seventh Circuit Court of Appeals. *Id.* at 56-64. CLS contends that this case is indistinguishable from <u>Mastrobueno</u> due to the similarity in the respective contracts' arbitration clauses and New York choice of law provisions. It urges this Court to find that an arbitration panel is empowered to award punitive damages in this case. This Court declines to do so.

Just as the applicability of a condition precedent is not a "question of arbitrability" for the courts, so too a question as to the availability of punitive damages. It is a question for the arbitrator and this Court declines to make the determination CLS seeks. For the same reason, this Court rejects the Town's request that it stay arbitration and resolve the validity of CLS's punitive damages claim.

## IV.  CONCLUSION

This Court finds that the Town of Amherst has failed to demonstrate any basis upon which to stay arbitration. Because there is nothing further for this Court to decide, dismissal of this action, with prejudice, is appropriate.

**ORDERS**

IT HEREBY IS ORDERED, that Plaintiff Town of Amherst's Petition to Stay Arbitration (Docket No. 1-3) is DENIED.

FURTHER, that this case is DISMISSED in its entirety.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.

Dated:        November 30, 2007
              Buffalo, New York

                                        /s/William M. Skretny
                                         WILLIAM M. SKRETNY
                                        United States District Judge